UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 07-10195-RWZ

UNITED STATES OF AMERICA

v.

PASCUAL LUNA

MEMORANDUM OF DECISION
August 5, 2008

ZOBEL, D.J.

Defendant, Pascual Luna, has been indicted for violating 18 U.S.C. § 922(g)(1), being a felon in possession of a firearm (Count One), and 18 U.S.C. § 111, assaulting, resisting and interfering with Scott Conley, "a deputized Special Federal Officer while he was engaged in...his official duties" (Count Two). He has filed a motion to suppress certain statements made in the course of his arrest (Docket # 48) and to dismiss Count Two (Docket # 47) on the ground that Mr. Conley was not acting as a federal officer at the time of the arrest. After hearing the parties' evidence and argument, I denied the motion to suppress because the alleged offending statements were unsolicited outbursts by defendant, which were not in any way the result of any custodial interrogation. I took under advisement the motion to dismiss and now deny it without prejudice to renewal in the course of the trial.

From the evidence presented I find the facts relevant to the motion to dismiss as

follows: Scott Conley is a detective on the Chelsea Police Department ("CPD").  Since 2006, he has also been assigned to the North Shore Gang Task Force, a consortium of local, state and federal law enforcement officers under the direction of the FBI.  In January 2007 he was sworn in as a deputized federal Task Force Officer.  His relationship with the Task Force then became more formal and he actually worked with the other officers and agents.  His employer remained the CPD which paid his wages and directed his activities.  In the spring of 2007, he worked the 3-11 p.m. shift during which he would meet his Task Force partner, State Police Trooper Ball and, in conjunction with other members of the Task Force, investigate the activities of gangs in Lynn and other places within their jurisdiction.  He would keep his superiors at the CPD informed of his doings and usually respond to calls from CPD when he was needed for Chelsea business.

On May 1, 2007, an immigration rally and march were to start in Everett, Massachusetts, continue to Chelsea and end at Maverick Square in East Boston.  The police expected it to be large and considered the possibility of violence.  Mr. Conley worked his regular Chelsea shift that day and, with two other Chelsea officers, was assigned to march "as escort" to the rally.  He wore his Chelsea Police shirt and ultimately filed his report with the CPD.  As was his wont while he was performing his dual roles, he called FBI Agent Jeff Wood, the agent in charge of the Task Force, before the rally to inform him thereof and discussed with him whether any of the gangs they had been investigating might be represented at the rally.  He also called him after the event to report the arrest of defendant, who was a person of interest in the

investigation.

Detective Conley went to Everett City Hall where the march was to start. He was to accompany the marchers and report to the CPD his observations about the size of the group, the route they took, the participants and whether they included known gang members, the number of cars and any other information useful in addressing any contingencies. As he was walking along with the parade, Conley saw defendant standing in front of a building known as Roca. He knew defendant and he knew him to be unpredictable and often armed. While he was considering how to proceed in the safest possible manner, defendant looked at Conley and ran away. Conley gave chase. Defendant did not heed his shouts of "Police, stop, drop the gun" and at one point turned around and shot at Conley, before he threw the gun away. Several other officers converged on defendant, caught and arrested him.

The parties agree that the threshold question is whether Conley qualifies as a federal officer at the time of the assault and therefore whether defendant can be prosecuted under § 111. They also agree that the issue is jurisdictional and that it is a legal issue for determination by the court. The facts of this case also give rise to a second question, namely whether defendant assaulted Conley "while he was engaged in, and on account of the performance of his official duties." This, the parties also agree, is a question for the jury. The case law concerning Conley's status is sparse and devoid of any decisions by the First Circuit.

The origins of § 111 date back to the Act of May 18, 1934, c. 299, 48 Stat. 780. 1934. The Supreme Court, in analyzing the legislative history of this statute, suggested

that its purpose was "to insure uniformly vigorous protection of federal personnel, including those engaged in locally unpopular activity" such as enforcing prohibition and civil rights laws.  United States v. Feola, 420 U.S. 671, 681 (1975).  It is likely, therefore, that Congress had no intent to extend protection to all local law enforcement with a federal connection, since local officers are unlikely to have a problem obtaining state action against defendants who assault them.

Most of the case law cited by both parties addresses situations where a defendant was charged with § 111 for assaults against non-deputized local police under the "any person assisting such an officer or employee" clause of § 1114.  Such precedent is inapplicable here, because Conley was not under the direction of a federal officer at the time of Luna's arrest and therefore not entitled to protection under § 111 for assisting a federal officer.  Compare United States v. Reed, 375 F.3d 340 (5th Cir. 2004) (§ 111 not applicable because assaulted police officer responding to bank robbery was not "assisting" FBI agent riding in car on his way to the crime scene), with United States v. Williamson, 482 F.2d 508, 512 (5th Cir. 1973) (statute applies to state officer assaulted while involved in surveillance of suspect by a detail of federal and state narcotics agents under the direction of a federal agent), and United States v. Hooker, 997 F.2d 67, 69 (5th Cir. 1993) (statute applies where defendant kicked and assaulted state narcotics officer who bought drugs from him while DEA agents stayed back for surveillance with warrant to serve after buy).

Several cases relied on by the government involving deputized police officers found to be entitled to protection under § 111 do not distinguish between the "officer or

employee of the United States" clause and the "assisting such an officer or employee" clause of § 1114.  See United States v. Diamond, 53 F.3d 249, 251 (9th Cir. 1995) ("[We agree] that Strovink was entitled to protection under § 111 because he was cross-deputized as a special deputy U.S. marshal, and because he was acting under the control of FBI Agent Renning [who was present at the assault]"); United States v. Martin, 163 F.3d 1212, 1215 (10th Cir. 1998) ("[W]e hold that Detective O'Rourke was a federal officer within the meaning of §§ 115 and 1114 or, alternatively, that he would come within the scope of the relevant statutes as an individual assisting a federal officer.").

It appears that only two cases have interpreted §§ 111 and 1114 to include local members of a federal and state task force while engaged in activity that is purely state law enforcement.  In United States v. Torres, the Third Circuit, relying on cases interpreting the "assisting" clause, extended § 111 protection to a Philadelphia city policeman assigned to the Federal Drug Enforcement Administration Task Force investigating a state crime.  862 F.2d 1025 (3d Cir. 1988).  The court concluded that "a city policeman assigned to the United States Drug Enforcement Agency may be a de facto agent within the scope of a statute prohibiting assaults on federal officials."  Id. at 1029.  In an unpublished decision, the Eleventh Circuit held that a state police official, who for all intents and purposes was acting in the capacity of an FBI agent, was entitled to § 111 protection when he happened upon a car jacking while driving home.  United States v. Garrett, 172 Fed. Appx. 295 (11th Cir. 2006).  In that case, the police officer "worked in an office in the FBI offices in Atlanta, used FBI equipment, drove an

5

FBI vehicle, and reported to [a] FBI Supervisory Special Agent." Id. at *299.  In addition, the FBI reimbursed the state for the officer's salary and overtime and paid for his training at FBI facilities.  Id.

I conclude that Conley, as a sworn member of the FBI Task Force, was an "officer or employee of the United States" within the meaning of § 1114 and thus entitled to protection under § 111.  Nonetheless, whether defendant shot at him (as alleged) "while he was engaged in or on account of the performance of official duties" is a question for the jury.  Although the evidence on this issue is not without doubt, this determination is best reserved until all the facts have been presented at trial.

In summary, the motion to suppress is denied; the motion to dismiss Count Two is denied without prejudice to renewing it during or after the trial.


|     August 5, 2008     |     /s/Rya W. Zobel     |
|         DATE           |     RYA W. ZOBEL        |
|                        | UNITED STATES DISTRICT JUDGE |