UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

BOSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Respondent, | ) | |
| | ) | |
| | ) | |
| vs. | ) | Civil No.: _____ |
| | ) | Crim. No.: 1:07-CR-10195-RWZ |
| | ) | |
| | ) | |
| PASCUAL LUNA, | ) | |
| | ) | |
| Movant. | ) | |

## MEMORANDUM OF LAW AND FACTS SUPPORTING
## SECTION 2255 MOTION

COMES NOW, Pascual Luna, the Movant acting pro se in the above-
captioned case, and respectfully submits this Memorandum of Law
and Facts in Support of the accompanied Motion to Vacate  under
28 U.S.C. § 2255.  Such motion is incorporated by reference herein.

For GOOD CAUSE in this Court granting relief under § 2255,
the Movant would aver as follows:

### I. JURISDICTION OF THE COURT

This Court has proper subject matter jurisdiction to entertain and
rule on Movant's post-conviction motion pursuant to 28 U.S.C. §
2255(1). Trenkler v. United States, 536 F.3d 85 (1st Cir. 2008).

### II.  PRELIMINARY PRO SE STATEMENT

The Movant in this case is prosecuting this post-conviction motion
pro se without the benefit of professional legal assistance. There-
fore, the Court is urged to liberally construe the Movant's plead-
ings as established by long standing authority. See Haines v. Kerner,

- 1 -

404 U.S. 519, 520-21 (1972)(per curiam); Rainer v. United States, 233 F.3d 96, 97-98 (1st Cir. 2000).

### III. PROCEDURAL DEFAULT/WAIVER ISSUES

There are no waivers of collateral review in this case as Movant exercised his Constitutional Right to a jury trial and preserved all of his rights for review accordingly.

Further, all of the Movant's claims for relief are predicated on the Sixth Amendment's guarantee of effective assistance of counsel as interpreted by the United States Supreme Court. See Strickland v. Washington, 466 U.S. 688 (1984). Consequently, there are no procedural default issues raised insomuch as allegations of ineffective assistance of counsel are properly raised in an initial and timely filed § 2255 motion. Massaro v. United States, 538 U.S. 500, 505 (2003). Moreover, claims of ineffective assistance of counsel are not subject to procedural default under Frady. Murray v. Carrier, 477 U.S. 478, 488-89 (1986); Lynch v. Ficco, 438 F.3d 35, 46 (1st Cir. 2006).

### IV. BACKGROUND OF CASE

#### 1. Procedural Background

On October 9, 2008, a federal grand jury sitting in the District of Massachusetts returned a Superseding Indictment (DK No.102) charging the Movant with: Count I, Possession of Ammunition by Convicted Felon 18 U.S.C. § 922(g); Count II Assaulting a Federal Officer 18 U.S.C. § 111; and Count III, Using Firearm During a Crime of Violence 18 U.S.C. § 924(c).

The Movant proceeded to trial on May 18, 2009, and after a five day trial the jury returned guilty verdicts on all three of

the Counts of the indictment (DK No.134).

On August 26, 2009, the District Court sentenced Movant to 15 years incarceration as to Counts I and II, and 10 years consecutive on Count III with 4 years supervised release and $300.00 assessment fees (DK No.150).

A timely Notice of Appeal was filed on August 26, 2009, (DK No.151) and the First Circuit Court of Appeals subsequently affirmed Movant's conviction and sentence on August 12, 2011. See United States v. Luna, Appeal No. 09-2263.

The United States Supreme Court denied Movant's Petition for Writ of Certiorari on December 12, 201 See Luna v. United States, Case No. 11-7278.

## 2. Alleged Criminal Conduct [1]/

Sometime in 2006, Detective Scott Conley of the Chelsea Police Department was recruited by the Federal Bureau of Investigation ("FBI") to assist the FBI North Shore Gang Task Force's investigation of drug and firearm trafficking by leaders, members, and associates of the Almighty Latin King and Queen Nation (the "Latin Kings") in Chelsea, Massachusetts. That investigation led to, in September 2006, federal and state drug and firearm charges against 17 alleged leaders, members, and associates of the Latin Kings in Chelsea. The Movant was supposedly identified as an influential member of the Latin Kings in Chelsea, and was therefore a target of the FBI investigation. The Movant was in jail on state charges throughout the duration of most of the federal investigation, and

---

[1]/ The Movant went to trial and vehemently disputes the prosecution's evidence, but for the purpose of this motion the Movant will respect the jury's verdict and recite the facts as presented by the government.

therefore no federal case was made against him at that time.

In January 2007, Detective Conley was deputized by the FBI as a Special Federal Officer to work more formally with  the  North Shore Gang Task Force.  According to Government witnesses' testimony, Detective Conley's responsibilities as a Special Federal Officer included gathering intelligence on gang members in Chelsea, and North Shore cities to disrupt and dismantle  violent  street gangs.  Detective Conley also reported to the FBI every day, either to Special Agent Jeffrey Wood, the agent in charge of the  North Shore Gang Task Force, or Wood's supervisor, Supervisory Special Agent John Woudenberg, and was expected to relay information to them.

On May 1, 2007, Detective Conley, Sergeant Daniel Delaney, and Lieutenant David Batchelor, who were members of the Chelsea Police Department's gang unit, were assigned by the Chelsea Police Department to work an immigration parade in Chelsea because of gang violence that occurred during the parade in prior years. Testimony showed that Detective Conley spoke with Special Agent Wood by telephone on the morning of May 1, and Wood informed Conley that the FBI was interested in any intelligence about  gang  members  who might try to disrupt the rally or take part in the rally, and also asked Conley if he thought Movant would be at the parade.

Detective Conley had been investigating the Movant in connection with his work with the North Shore Gang Task Force. Detective Conley had known the Movant for about 10 years from the streets of Chelsea, as had Sergeant Delaney.  In fact, Movant had allegedly told Detective Conley that he was a member of the Latin Kings, and

- 4 -

Conley had seen Luna on numerous occasions dressed from head to
toe in the black and gold colors of the Latin Kings.  Lieutenant
Batchelor had also known Movant for a couple of years and, like
Detective Conley, knew that Movant was an influential member of
the Latin Kings.  Morevoer, at the time of the parade, the offi-
cers knew that Movant had several outstanding state warrants for
firearm-related offenses.

     The parade started in Everett, Massachusetts, and finished
in Chelsea.  Detective Conley and the other two officers  were
driving in an unmarked police car trailing the parade, and were
in plainclothes with shirts or jackets and badges around their
necks identifying them as Chelsea police officers.  As the parade
reached the corner of Cross Street and Park Street in Chelsea,
Detective Conley saw Movant standing with several other individ-
uals in front of a community center for young people called "Reach-
ing Out to Chelsea Adolescents."  Detective Conley advised Sergeant
Delaney and Lieutenant Batchelor that Movant was across the street.

     The officers decided to wait until most of the spectators and
marchers had passed by before trying to arrest the Movant. As they
waited, Movant made eye contact with Detective Conley and began to
walk in the opposite direction down Park Street. As soon as Detec-
tive Conley and Sergeant Delaney got out of the car, Movant alleg-
edly took out a gun from his waistband and held it in his right
hand.  Detective Conley yelled at the Movant to drop the gun, but
Movant kept it in his right hand, alternatively holding it  and
trying to stuff it back into his pants.

     Detective Conley and Sergeant Delaney chased  Movant  down

- 5 -

Division Street while Conley continued to yell at the Movant to stop and to drop the gun.  A third officer, Nuno Almeida of the Massachusetts Bay Transit Authority Police, joined the chase behind Conley and Delaney.  When the Movant reached the Hotel Stanley, he wheeled around and allegedly took a shot at Detective Conley and Sergeant Delaney.  Sergeant Delaney felt a burning sensation and heard a "ping" as if the bullet hit the wall or door next to him, and, believing the shot was a "through and through" (i.e., that the bullet had gone through him), grabbed his left side, and went down.  Detective Conley also went down and then, after Conley checked to see if Sergeant Delaney was alright, both officers began to chase after Movant again.  Lieutenant Batchelor, who was in his car on Congress Avenue in front of the Hotel Stanley when he heard a shot and saw the Movant run around the corner from Division Street, chased after him in his car while Detective Conley, followed by Sergeant Delaney and Officer Almeida, chased him on foot.

Officer Raul Goncalves of the Everett Police Department, who was working the parade in his squad car and monitoring the chase on the radio, heard a broadcast of shots fired and recognized the Movant's name because he had arrested the Movant in Everett a few months earlier.  Officer Goncalves drove down Park Street toward Congress Avenue to try to cut off Movant and, as he reached Park and Congress, saw the Movant, who was running with the gun, take a left on pearl Street.  Officer Goncalves drove his car by Movant on Pearl Street, cut him off, and got out of his car with his weapon drawn.  The Movant, who was standing about 10 feet away, pointed

- 6 -

his gun at Goncalves and Goncalves pointed his gun at Movant while yelling at him to drop his gun.  The Movant dropped the gun, ran across the street, and was grabbed by Goncalves, Lieutenant Batchelor, and other officers.

The officers were not sure if the Movant still had the gun or another weapon, and repeatedly yelled at him to show his hands. The Movant resisted arrest and refused to show the officers his hands, instead threatening the officers with such words as,  "All  you mother-f***ers are dead"; "I'm going to cap all you mother-f***ers"; and "[f]ive poppin' six dropping, all you mother-f***ers are dead."

After the Movant was handcuffed and arrested, Officer Goncalves ran across the street and secured the gun Movant allegedly dropped. The gun turned out to be a .38 caliber Smith & Wesson revolver, containing five silver plated rounds of .38 Special, Remington ammunition bearing the head stamp "R.P..38 Spl.+P," with  one  of  the rounds a spent casing.

The revolver was successfully test-fired, and Trooper Brian Lombard of the Massachusetts State Police testified that he examined the revolver and the ammunition and determined that the spent casing was fired from the revolver.  Special Agent Mattheu Kelsch of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") also testified that the ammunition was manufactured by Remington Peters, a company which had been purchased by the Remington Arms Company, and that Remington Peters had never manufactured ammunition in Massachusetts, but had only manufactured ammunition in its facilities in Bridgeport, Connecticut and Lonoke, Arkansas.

## V. GROUNDS FOR RELIEF

A. THE MOVANT WAS DENIED EFFECTIVE ASSISTANCE OF COULSEL AS
   GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES
   CONSTITUTION. Strickland v. Washington, 466 U.S. 688 (1984)

1. Counsel Was Ineffective Both Pre-Trial And on Appeal For
   Failing to Argue That 18 U.S.C. 924(c) Was Unconstitutional
   As Applied to This Petitioner Because the Court Lacked Juris-
   diction Over The Firearm, And The Charge was Multiplicitous
   When Coupled With 18 U.S.C. § 111(b).

Each claim of ineffective assistance is subject to a two
part test. (1) that his counsel's performance was deficient, and
(2) that the deficient performance prejudiced the defense. See
Strickland. It has further been stated in Stalling v. United States,
536 F. 3d 624 (7th Cir. 2008), that "When a Petitioner contends
that his appellate counsel was ineffective because he overlooked
a meritorious argument, we first examine the record to see whether
the appellate attorney in fact omitted "significant and obvious"
issues. Suggs, 513 F.3d at 678, Martin, 384 F. 3rd at 851-82. If
so, we compare the neglected issue to those actually raised; If
the ignored issues are "clearly stronger" than those actually
raised, appellate counsel was deficient."

This Petitioner, was charged in Count Two of a superseding
indictment with violating 18 U.S.C. § 111 (Assauting, Resisting,
or Impeding Certain Officers or Employees). In addition Count Two
reads, in relevant part, "The grand jury further alleges that the
offense described herein was committed by means and use of a dan-
gerous weapon, that is a firearm. Accordingly, Title 18, United
Code, Section 111(b) is applicable to this count.

Petitioner was further charged in Count Three with violation
of 18 U.S.C. § 924(c)(1)(A) - Carrying, and discharging a Firearm
During and in Relation to a Crime of Viloence. This count of the
indictment reads in relevant part, "the defendant herein knowingly
and intentionally used and carried a firearm, to wit: a .38 caliber
Smith & Wesson revolver, bearing serial number J27154, during and
in relation to a crime of violence, to wit: Knowingly and frocibly
assaulting, resisting, opposing, impeding, intimidating, and inter-
fering with SCOTT CONLEY, a deputized Special Federal Officer,
while he was engaged in, and on account of the performance of, his
official duties, in violation of 18 U.S.C. § 111, as charged in
Count Two of this Indictment."

When the above two counts are charged in the same indictment,
serious Constitutional issues arrise, as well as conflicts of law.
For instance, it is undisputed that the firearm in question in
this case did not travle in interstate commerce and therefore dose
not fall within the Jurisdiction of the Federal Government. And
Petitioner was not charged with the possession of this firearm.
However, 924(c) is an attempt to regulate the possession and use
of firearms that are not within Federal jurisdiction by connecting
to another crime that is within Federal jurisdiction. In other
words, through word play, regulate firearms without haveing to
say that 924(c) is an attempt to regulate firearms.

The only problem to this logic is that the actual wording of
18 U.S.C. § 924(c) says otherwise. 942(c) reads as  follows:

> "Except to the extent that a greater mandatory minimum
> sentence is otherwise provided by this subsection or by
> any other provision of law, and person who, during and

in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for enhanced punishment if committed by use of a deadly or dangerous weapon or device) for which a person may be prosecuted in a court of the United States, **uses or carries a firearm**, or who, in the further-erence of any such crime, **possess a firearm**, shall in addition to the punishment provided for such crime...."

So it is clear that the congressional intent was to regulate the "Use," "carring," and "Possession," of firearms. But just like the statute in United States v. Lopez, 514 U.S. 549, 552-559, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995), "the Act contains no jurisdic-tional element which would insure that **the firearm possession in question affected interstate commerce**, that is, the Act has no ex-press jurisdictional element which might limit the Acts reach to a discrete set of firearm possessions that **additionally** **have an ex-plicit connection** with or effect on interstate commerce."

The word "additionally" is key because it indicates that first the Government must have jurisdiction over the firearm and the pos-session, "and" the possession must have an effect on interstate commerce. Here, the fact that the gun never left the State of Massa-chusetts means that one of the two elements is missing, and the 924(c) charge should have never been brought in the superseding indictment. The possession of the firearm should have been left to the State.

The Supreme Court further stated in Lopez, 514 U.S. 549, that it would not "convert congressional authority under the commerce clause to a general police power of the sort retained by the states, and concluded that there would never be a distinction between what is truly national and what is truly local." See also United States

v. Morrison, 529 U.S. 598, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000).
No federal jurisdiction over the firearm means that neither Congress
or the Courts can regulate possession, carrying, or use of that fire-
arm.

## Multiplicity:

Another problem with charging both 18 USC § 111(b) and § 924(c)
in the same indictment is that they are multiplicitous. "Muntiplicity"
refers to the practice of charging the commission of a single offense
in several counts. This practice is prohibited because a single
wrongful act cannot furnish the basis for more than one criminal
prosecution. United States v. Stanfa, C.A. Pa., 685 F.2d 85, 86,
State v. Hill, 10 Kan. App. 2d 607, 706 P. 2d 472, 475. The Federal
Rules of Criminal Procedure have been drafted to discourage this
practice. United States v. Allied Chemical Corp. D.C. Va., 420 F.
Supp. 122.

In this case, it is alleged that a Federal Officer was shot at
in violation of § 111(b). The indictment specifically states that a
firearm was used. § 924(c) requires that the government must prove
that a firearm was used in the commission of a crime of violence,
but it is a seperate statute that must be charged in the indictment
and proved to a jury beyond a reasonable doubt, it carries it own
penalty. For instance a defendant can, as often happens, plead only
to a violation of § 924(c) in exchange for the government droping
the crime of violence because § 924(c) provides mandatory minimum
penalties for brandishing and/or discharging a firearm (see § 924(c)
(1)(A)(ii) & (iii). This would be permissible as long as a defendant

admits to committing the crime of violence so that there was a proper factual predicate that formed the basis of both the plea and the resulting sentence.

But in this case, the two counts in the indictment cannot pass "the 'same elements' test" prescribed by the Supreme Court in the case of Blockburger v. United States, 284 U.S. 299, 304, 76 L. Ed. 306, 52 S. Ct. 180 (1932). There the court ruled that counts are not multiplicitous only if each counts requires proof of an element that the other count does not. Count Two, the § 111 count, reads "the offense described herein was committed by means and use of a dangerous weapon. **that is a firearm**." The addition of the words "that is a firearm," gave the 111(b) count all of the same elements of the § 924(c) count. In other words, if convicted of the course of conduct alleged in the § 111 count, the defendant would automatically be guilty of the § 924(c) count since § 924(c) also punishes the use of a firearm in furtherence of a crime of violence. There is no seprate element that is necessary for conviction under § 924(c) that is not already contained in the indictment for the § 111 count.

The Supreme Court in Blockburger, 284 U.S. 299, went on to explane that "The test is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately....If the latter, **there can be but one penalty**." Both § 111(b), and § 924(c) address the exact same course of conduct even though they are seperate statutes that must be presented to a grand jury, and proved to a jury beyond a reasonable doubt. When both are charged in the same indictment in the manner that they have been charged here, they are multiplicitous,

- 12 -

and the defendant can only be assessed one penalty. The 10 year penalty for violation of § 924(c) should be vacated, and both trial counsel and appellate counsel were ineffective for failing to raise this critical issue. The prejudice to the defendant is that the failure to address these issues subjected him to an additional 10 year sentence that he never should have had.

## Double Jeopardy

The way in which the indictment is written also violates the Petitioner's Constitutional right not to be subjected to Double Jeopardy. The Fifth Amendment protects against a second prosecution for the same offense after acquittal or conviction, **and** against multiple punishments for the same offense. North Carolina v. Pearce, 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656. In assessing a claim of double jeopardy, the "same evidence test" must be applied.

The "Same-evidence test" used in determining issues of double jeopardy is whether facts alleged in a second indictment (or count), if introduced in evidence, would have sustained a conviction under the first indictment or count, or whether the same evidence would support a conviction in each case. United States v. Liotard, 817 F.2d 1074, 1077. Again, from the wording of the indictment, if convicted of violating § 111(b), the defendant would, without any additional evidence needing to be presented, also be guilty of count Three (§ 942(c)). Therefore his Fifth Ament right has been violated and the § 924(c) count must be vacated.

Further, both Trial and Appellate counsel were ineffective for failing to raise this constitutional claim, and this court should so rule.

THE MOVANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS
GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES
CONSTITUTION. Strickland v. Washington, 466 U.S. 688
(1984).

## 2. Counsel Failed to Adequately Advise Movant with Respect to the Movant's Decision to Eschew Plea Negotiations and Proceed to Trial.

Movant alleges that Attorney Edward J. Lee (and Attorneys Elizabeth
A. Lunt and Emma M. Quinn-Judge before him) failed to provide the
Movant necessary legal advice/knowledge and information to allow
him to make an informed and intelligent decision whether he (Movant)
should attempt plea negotiations or risk a jury trial. Had counsels
provided the Movant with competent and adequate legal advice, the
Movant would have been amenable to plea negotiations which could
have resulted in Movant pleading guilty and receiving a signifi-
cantly lesser term of imprisonment. Cf. Hill v. Lockhart, 474 U.S.
52, 56-57 (1985); Berthoff v. United States, 1999 U.S. App. LEXIS
34496 (1st Cir. 1999)[citing Boria v. Keane, 99 F.3d 492, 496-97
(2nd Cir. 1996)(holding failure to discuss with client the advisa-
bility of plea bargaining amounts to ineffective assistance)].

It is the Movant's contention that Attorney Lee failed to
begin at sqaure one when assigned to the Movant's case after pre-
vious attorneys were removed. Apparently, Attorney Lee assumed
that the Movant understood the applicable sentence exposure; the
operation of Federal Sentencing Guidelines to his case; the nature
and elements of the criminal charges; and the prosecution's case
and evidence related to the criminal charges. Attorney Lee assumed
that Attorneys Lunt and Judge before him had provided the Movant

- 14 -

with all of the necessary information and advice required to make an intelligent decision whether to pursue plea negotiations or take the case to a jury trial.

Because of Attorney Lee's assumptions, the Movant's decision to eschew plea negotiations and risk a jury trial was not made knowingly and intelligently. Had counsel provided the Movant with adequate legal advice, the Movant would have realized the prudence in plea negotiations and would have avoided a jury trial, resulting in a lesser term of incarceration than the 300 months handed-down by the Court after the Movant's jury trial (see Exhibit "A," Affidavit of Pascual Luna, ¶¶ 5, 7 ).$\underline{3}$/

First, counsels failed to apprise the Movant of the Federal Sentencing Guidelines provisions as applicable to Movant's case. For example, Movant was not informed that a timely guilty plea would result in as much as a three-level reduction of the Movant's applicable Base Offense Level ("BOL") under U.S.S.G. § 3E1.1(a) & (b) (Luna Aff., ¶¶ 3-5 ). Further, the Movant was not made aware of the other Guidelines' provisions that would ultimately impact the Movant's case (id., ¶¶ 3-5 ). Cf. Berthoff v. United States, 140 F.Supp.2d 50, 58 (D. Mass. 2001); United States v. Gordon, 156 F.3d 376 (2nd Cir. 1998); United States v. Day, 969 F.2d 39, 43 (3rd Cir. 1992).

Secondly, although the Movant may have been convinced of his innocence of the charges, counsels should have explained to him the prudence in a negotiated plea agreement and guilty plea. Criminal jurisprudence acknowledges circumstances in which an accused may

_____

$\underline{3}$/ Hereafter referred to as the "Luna Aff."

- 15 -

plead guilty to avoid trial and the severe sentence exposure not-
withstanding the defendant's subjective belief of innocence.[4/]  And
Movant's case presented a textbook example of circumstances where
a defendant would have substantially benefited by pleading guilty
to avoid a very long prison sentence.  Had counsels advised Movant
of the operation of sentence guidelines, and benefits in accepting
responsibility, the Movant would most definitely considered pleading
guilty instead of going to trial (Luna Aff., ¶¶ 5,7  ).

    Thirdly, counsels failed to adequately explain the charges
faced by Movant, or the complex elements of such charges (Luna Aff.,
¶¶3,4,8 ).  More specifically, Movant complains that his attorneys
did not fully apprise him of the nature and elements of assaulting
a "federal officer" as charged and defined under 18 U.S.C. § 111(b),
or adequately advise Movant with respect to the firearms offenses
charged under 18 U.S.C. §§ 924(g) and 924(c).  Further, the Movant
was not properly advised about the Armed Career Criminal  laws as
applied to his criminal history and/or facts of the case (Luna Aff.,
¶¶6,8,9,11).

    The decision to plead guilty or risk a jury trial rests with
the defendant in a criminal case, but the defendant must rely on
his attorney's superior experience, training in criminal law and
wisdom to make an informed and intelligent decision to plead guilty

---

**4/**    See North Carolina v. Alford, 400 U.S. 25, 33 (1970)
       ("reasons other than the fact that he is guilty may
       induce a defendant to so plead . . . and he must be
       permitted to judge for himself in this respect"); Cf.
       Lelani v. United States, 2009 U.S. App. LEXIS 3847
       (11th Cir. 2009)(rejecting district court's finding
       that claim of innocence belies allegation that defen-
       dant would have pled guilty).

or risk a jury trial.  An attorney has a Constitutional obligation under the Sixth Amendment to <u>fully</u> and <u>adequately</u> inform his client of the available options related to a criminal prosecution.  One Circuit Court of Appeals described a counsel's responsibilities in this regard as follows:

> [A] criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available.
>
> <u>Smith v. United States</u>, 348 F.3d 545, 553 (6th Cir. 2003).

In the Movant's case, counsel failed to adequately explain the elements of § 111(b) vis-a-vis the specific facts and evidence to be presented by the prosecution (Luna Aff., ¶¶ 3, 8).  In fact, Attorney Lee mislead the Movant by suggesting that the prosecution could not legally prove that Chelsea Police Officer Scott Conley was a "federal officer" at the time of incident allegedly involving the Movant (Luna Aff., ¶¶ 3, 8 ).

One of the most critical duties of a criminal defense attorney is to <u>effectively</u>, <u>adequately</u>, and <u>correctly</u> advise his defendant about whether or not he should plead guilty or venture a trial by jury.  <u>Boria</u>, 99 F.3d at 496-97; <u>Berthoff</u>, 1999 U.S. App. LEXIS 34496 (1st Cir. 1999); <u>United States v. Herrera</u>, 412 F.3d 577, 579-80 (5th Cir. 2005); <u>Trejo v. United States</u>, 66 F.Supp.2d 1274, 1285-86 (S.C. Fla. 1999)(defendant "detrimentally relied" on counsel's legal advice, and there is a reasonable probability that the defendant would have pled guilty had it not been for counsel's deficient performance).

Finally, in light of the discovery that was available to counsel, the evidence that the prosecution intended to present, and the legal authority applicable to the evidence and charges, counsel should have—but did not—advise the Movant to pursue plea negotiations. Had counsel properly advised the Movant in this regard, there is no doubt that Movant would have pled guilty and received a sentence significantly less than twenty-five years without parole (Luna Aff., ¶¶ 5, 7 ). Cf. Teague v. Scott, 60 F.3d 1167, 1171 (5th Cir. 1995); Padilla v. Kentucky, 130 S.Ct. 1473 (2010)(a "critical obligation of counsel [is] to advise the client of the advantages and disadvantages of a plea agreement"); Cf. Berthoff, 140 F.Supp.2d at 58 ("Surely it is not too much to expect defense counsel to advise a client of the expected results" if he goes to trial or pleads guilty).

## 3. Counsel Failed to Adequately Advise the Movant to Pursue Plea Negotiations for a Lesser Sentence.

This issue is part-and-parcel of Issue One above insomuch as counsels failed to properly advise the Movant with respect to the most advantageous course of action. The Movant's attorneys should have advised the Movant to pursue a negotiated plea agreement notwithstanding the Movant's subjective assertions of innocence. Instead, counsels simply accepted the Movant's lay-person understandings of criminal law and pursued one course of action: take Movant's case to trial.

Counsels had an obligation to sit down with Movant and bluntly tell him that there was a formidable amount of evidence against the Movant in the form of police officers' testimony. And that there was enough direct physical evidence to convict the Movant if he

proceeded to a jury trial.   None of Movant's attorneys did this,
but they entertained—if not enabled—the Movant's misconceptions
about the law.   For example, the Movant believed (erroneously) that
Chelsea Police Sgt. James Atkins arrest for stealing funds ruined
his ability as prosecution witness  and  prevented the Government
from using as evidence the firearm and ammunition seized on the day
of the incident (Luna Aff, ¶¶ 10   ).$\frac{5}{}$   Instead of advising Movant
that the prosecution could lawfully use   the   evidence despite the
break in the chain-of-custody caused by Sgt. Atkins, counsel waited
and attempted to have the District Court Judge explain the issue on
the first day of Movant's trial (see Tr. Vol. 5/18/09, pp. 9-11).

     Further, the Movant believed that Chelsea Police Officer Scott
Conley was working for the Chelsea Police Department on the day of
the incident and, therefore, could not possibly  be  determined by
the jury to be a federal police officer under § 111(b) at that time.
At no time did any of Movant's defense attorneys tell him that the
District Court Judge would open the trial by instructing the jury
that Conley was a federal officer as  a  matter  of  law (Tr. Vol.
5/18/09, pp. 138-39).   This and other issues that counsels failed to
explain to the Movant would have been powerful   incentives   for the
Movant to pursue plea negotiations—had  counsels  explored  that
avenue with the Movant (Luna Aff., ¶¶ 8,11).

4.   Counsel Was Ineffective for Not Challenging the Racial
     Composition of the Jury Venire or Movant's Petit Jury.

The Sixth Amendment forbids racial discrimination in the selection
of jurors and requires that the jury venire from which a defendant's

---

5/   Officer Atkins was charged with and convicted of embez-
     zling money from Chelsea high football booster club.

petit jury is selected represents a fair cross-section of the commu-
nity where the jury trial takes place. Taloy v. Louisiana, 419
U.S. 522 (1975); United States v. Benjamin, 252 F.3d 1, 12 (1st
Cir. 2001).

Movant alleges that the jury venire from which his petit jury
was drawn did not contain a single Hispanic or other minority.[6/]
Movant further contends that his petit jury was an all-white group
and counsel never objected to the selection process or the composi-
tion of Movant's petit jury panel. Cf. Birt v. Montgomery, 709 F.2d
690 (11th Cir. 1983); Hughes v. United States, 258 F.3d 453, 463
(6th Cir. 2001).

Because of Attorney Lee's failure to object, or preserve for
review, the jury selection process or the composition of the petit
jury panel, the Movant was deprived of his Constitutional Right to
a fair trial as guaranteed by the Due Process of Law Clause of the
Fifth Amendment, U.S. Constitution.

According to the latest voter registration and census figures,
the District of Massachusetts (Boston Division area) should produce
a jury venire that fairly represents the 21 % of jury-eligible His-
panics and the 19% of African-Americans in that district.[7/]

In light of the obvious absence of Hispanics or African-
Americans in the Movant's jury venire pool, and the apparent
systematic under-representation demonstrated in jury panels previ-
ous to the Movant's trial, counsel should have challenged the jury

_____

6/   The Movant is a member of a Hispanic ethnic group.

7/   Data from 2010 census records.

selection process pursuant to the Jury Selection and Service Act of 1968 ("JSSA") under 28 U.S.C. § 1861 et seq. and the Due Process Clause. Duren v. Missouri, 434 U.S. 357 (1979); Bolling v. Sharp, 347 U.S. 497, 499-500 (1954); Smith v. Cunningham, 782 F.2d 292, 293-93 (1st Cir. 1986); United States v. Green, 389 F.Supp.2d 29 (D. Mass. 2005).

Had counsel challenged the jury-selection process that was in effect in the District of Massachusetts at the time of Movant's trial, as well as challenged the composition of jury panels, there is a reasonable probability that counsel could have established a prima facie case that the selection process did not produce a fair cross-selection of the community. Consequently, the Movant would not have been denied a jury trial by his peers as guaranteed by the Sixth Amendment. Batson v. Kentucky, 476 U.S. 79 (1986); United States v. Spock, 416 F.2d 165, 181 (1st Cir. 1969).

5. Counsel Failed to Move to Strike Jurors Connolly and Biedron Because of Their Biasness Against Movant.

Attorney Lee allowed the brother of a Massachusetts Commonwealth prosecutor to get on the Movant's petit jury (Tr. Vol. 5/18/09, pp. 66, 96). Then counsel failed to move to strike, or otherwise remove, Juror Biedron who initially lied during voir dire questions and did not reveal that her son was a police dispatcher (id., Vol. 5/19/09, pp. 5-7). Regardless of these jurors' assertions of being able to maintain impartiality, counsel should have sought to remove them, and was ineffective for not doing so.

As a direct consequence of counsel's failure to have jurors Connolly and Biedron removed from Movant's petit jury, the Movant was deprived of a fair trial by a jury of impartial, unbiased peers.

U.S. Constitution, VI Amendment; Holland v. Illinois, 493 U.S. 474, 480-81 (1990); Moore's Federal Practice (Criminal), § 624.03(1)(6). The Movant specifically told counsel to get rid of those two jurors because they were visibly hostile towards Movant and could not be unbiased as jurors (Luna Aff., ¶ 13).

### 6. Counsel Failed to Properly Move for Suppression of Firearm and Ammunition Evidence Because of the Lack of Custodial Foundation for Such Evidence, Or Argue the Issue Before the Jury.

The Chelsea Police Officer who allegedly discovered and seized the firearm and ammunition supposedly used by the Movant on the day of the incident was Sgt. Atkins. As previously noted, Sgt. Atkins was charged with and convicted of criminal conduct at the time of the Movant's trial (Tr. Vol. 5/18/09, pp. 9-11; Vol. 5/21/09, pp. 4-6).

Without Sgt. Atkins, the prosecution's chain-of-custody for the firearm was incomplete and, therefore, Movant instructed counsel to challenge the prosecution's chain-of-custody (Luna Aff., ¶¶ 14-19). Despite the Movant's urging, trial counsel refused to properly attack the Government's chain-of-custody either by motion to suppress or argue the issue before the jury.[8]

Counsel should have, but did not, seek to suppress the firearm and ammunition evidence because the Government failed to establish authenticity of the evidence under Rule 901(a), F.R.E. Moreover, assuming that the Court would have allowed the evidence under

---

[8]   It should be noted that the Government has consistently argued that chain-of-custody goes to weight of the evidence not admissability and therefore counsel could not seek to "suppress" the evidence. The Government may be accurate, but counsel was certainly not barred from arguing to the jury the "weight" of such evidence in light of the broken chain-of-custody—something that counsel also failed to do.

Rule 901(a), then counsel should have vigorously attacked the chain-of-custody related to the evidence before the jury. Had counsel shown the jury that Sgt. Atkins' credibility was impeached due to his criminal conduct, the jury may have reasonably discredited the evidence during deliberations, resulting in the Movant's acquittal. At the very least, counsel could have injected a large measure of reasonable doubt into the chain-of-custody determination.

## 7. Counsel Was Ineffective for Failing to Interview and Call Former Chelsea Police Sgt. Atkins to Testify.

The Movant repeatedly instructed Attorney Lee to interview and call Sgt. Atkins as a defense witness to attack the prosecution's case generally and the chain-of-custody related to the firearm in particular (Luna Aff., ¶¶14,15 ).

From before trial and during trial, the Movant demanded that counsel interview and call Sgt. Atkins as a witness (id., ¶¶ 14,15). On the fourth day of the Movant's trial, counsel brought the matter up before the Court (Tr. Vol. 5/21/09, pp. 4-9). Counsel's excuse for not calling Sgt. Atkins as a witness was because counsel did not know Atkins' state-of-mind and could not be sure to what he may testify (id., p. 7). Of course, this begs the question: Why Attorney Lee did not interview Sgt. Atkins and ascertain his state-of-mind and potential as a defense witness? (Aff. ¶14,15).

The Supreme Court has held that counsel's strategical choices are reasonable only if they are based on thorough investigations and objectively reasonable assessment of the particular circumstances of a case. See Wiggins v. Smith, 539 U.S. 510, 525 (2003):

> Counsel's strategic choices made after less-than-complete investigation are reasonable to the extent

> that reasonable professional judgments support
> the limitations on investigation.

Wiggins, 529 U.S. at 525.

Attorney Lee's choice not to call Sgt. Atkins as a defense witness cannot be supported with any reasonable professional judgments. Instead, counsel made an arbitrary decision not to call Sgt. Atkins as a witness. Common sense would seem to dictate that a lawyer should interview a person before making a determination whether to call him/her as a witness. For all counsel knew, Sgt. Atkins may have harbored resentment against the department and presented testimony favorable to the Movant. Alternatively, Sgt. Atkins may not have been the one who recovered the firearm, or could not identify the firearm as the one that he seized. Either way, Movant wanted Sgt. Atkins to be interviewed and called as a witness—which Movant had a Constitutional Right to do. Counsel deprived the Movant of his right and denied him effective assistance of counsel in the process.

## 8. Counsel Was Ineffective for Refusing to Interview and Call Chelsea Police Officer Sgt. James Atkins as a Defense Witness.

During the Movant's trial, Chelsea Police Officer and Supervisor of Criminal Investigation Services Daniel Delaney testified that Sgt. Atkins displayed the firearm seized at the time of the incident to him (Tr. Vol. 5/20/09, p. 91). Officer Delaney went on to testify that Sgt. Dana was in possession of the firearm at the Chelsea police station and showed it to Delaney at that time (id., p. 94).

Witness Delaney essentially corroborated his own testimony by including Officers Dana and Atkins in his recollections as to his observation of the firearm. The prosecution needed Delaney's

- 24 -

testimony to be credible because he was identifying the firearm
used as evidence at trial as being the same firearm seized on the
day of the incident.

Counsel should have called Sgt. Dana as a witness so counsel
could effectively impeach his credibility (and that of Officer
Delaney) by offering evidence that Sgt. Dana was found to have lied
about his being sick to improperly collect sick-leave payment from
the department.  But, like Sgt. Atkins, counsel wanted to protect
the Chelsea Police Department from embarrassment rather than effec-
tively defend the Movant.

9.  Counsel Failed to Interview and Call Two People Who
    Witnessed the Incident But Did Not Identify Movant
    as the Shooter from a Photographic Line-Up.

There is discovery materials in this case that contains information
that two individuals (names unknown) witnessed the shooting with
which the Movant was charged in this case.  These witnesses did not
identify the Movant as the shooter during a photographic line-up.

Counsel should have interviewed and called these witnesses on
behalf of the Movant.  These witnesses could have testified that
they were at the scene of the incident and observed the shooter and
the Movant did not match his description.  These two witnesses would
have raised reasonable doubt related to the law enforcement wit-
nesses' identification of the Movant as the shooter.  There is no
objectively reasonable excuse for not calling these individuals as
defense witnesses.  Cf. Currier v. United States, 160 F.Supp.2d 159
(D. Mass. 2001)(counsel who fails to interview or call a witness
who could have testified in favor of defendant can be constitution-
ally ineffective); Lena v. United States, 987 F.2d 48, 55 (1st Cir.

- 25 -

1993)(counsel's decision not to interview or call witnesses must be reasonably objective strategy in light of the facts of the case).

10. Attorney(s) Who Were Initially Appointed to Movant's
    Case in State Proceedings Were Ineffective for Not
    Having Gun-Powder Residue Test Performed on Movant.

The Movant was originally arrested by Commonwealth authorities and charged with State charges. It is the Movant's contention that the State Court lawyer(s) were ineffective for not immediately having the Movant subjected to Gun-Powder Residue testing to check for gun-powder residue on the Movant's hands and person.

Had the Movant been able to access the gun-powder testing pro-cess, there would have been conclusive evidence that Movant did not fire the weapon in question due to a lack of any gun-powder residue on the Movant's hands or person.

11. Counsel Failed to Procure DNA Expert Witness/Services
    to Effectively Pursue DNA Evidence Issues.

Movant repeatedly instructed Attorney Lee to retain the services of a DNA expert in order to analyze and possibly testify to DNA evi-dence recovered from the firearm seized by the police related to the shooting incident (see Luna Aff., ¶¶ 17,18).

The prosecution offered the testimony of DNA expert Christine Lemire (Tr. Vol. 5/20/09, pp. 122-44). Ms. Lemire testified that she had collected DNA from the firearm that was identifiable through scientific analysis (id., pp. 126-29). Movant was excluded as a source of the DNA collected, according to Lemire's testimony (id., p. 128). However, the source(s) of the DNA that could be identified was never determined through Ms. Lemire's testimony. Counsel failed to procure expert services to effectively cross-examine Expert Lemire, or serve to conduct an analysis on recovered

- 26 -

DNA in order to ascertain the source(s) of such biological evidence. <u>Anderson v. Butler</u>, 858 F.2d 16 (1st Cir. 1988).

## 12. Counsel Failed to Properly Object, Or Preserve for Review, Officer Scott Conley Inappropriately Testifying As An Expert Witness.

During its case-in-chief, the prosecution proffered the testimony of Chelsea Police Officer and Federal Task Firce Agent Scott Conley (Tr. Vol. 5/18/09, pp. 123-65). Officer Conley inappropriately testified as an expert witness without the defense given notice under Rule 16(a)(1)(G), F.R.Crim.P., or having the Court authorize Conley as an expert pursuant to Rule 702, F.R.E. Movant alleges that counsel was ineffective for not objecting to Conley's improper expert testimony or preserve the issue for appellate review.

It was the Government's theory at trial that the Movant was an active member of the Latin Kings street gang. In an effort to prove the Movant's association with the notorious Latin Kings, the Government had Officer Conley testify to his assignment to the Chelsea Gang Unit and the Federal Violent Gang Task Force (Tr. <u>id.</u>, pp. 123-26).

After describing the incident that had precipitated crimnal charges against the Movant (<u>id.</u>, pp. 128-59), Officer Conley went on to testify about specialized knowledge related to gangs generally and the Latin Kings in particular (<u>id.</u>, pp. 160-62). Officer Conley was not proffered, nor authorized by the Court, to provide the jury with expert testimony as required by Rule 702, F.R.E.

In 2000, Rule 701, F.R.E., was amended to include the additional requirement that testimony admitted under the rule "not [be] based on scientific, technical, or other specialized knowledge within the scope of Rule 702" F.R.E. As the advisory committee's

notes explain, this amendment was intended "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay-witness clothing." Fed. R. Evid. 701, advisory committee's note on the 2000 amendment. Instead, such expert testimony is subject to the pre-trial disclosure requirements of Fed. R. Civ. P. 26 and Fed. R. Crim. P. 16 and the additional reliability requirements imposed by Fed. R. Evid. 702. Id.; see also Fed. R. Evid. 702, advisory committee's note on the 2000 amendment (explaining intent to "provide some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testi-mony" in the wake of Kumho Tire Co. v. Carmichael, 526 U.S. 137, 143 L.Ed.2d 238, 119 S.Ct. 1167 (1999), and Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579, 125 L.Ed.2d 469, 113 S.Ct. 2786 (1993)).

Due to counsel's failure to object to Officer Conley's unduly prejudicial testimony, the Movant's criminal proceedings were sub-stantially prejudiced. Strickland, 466 U.S. at 691-92.

## 13. Counsel Was Ineffective for Not Properly Objecting to or Adequately Preserving for Review Hearsay Testimony by ATF Agent Matt Kelsch.

In order to prove the interstate nexus element for Title 18 U.S.C. § 922(g) charge against Movant, the Government introduced the testi-mony of ATF Agent Matt Kelsch (Tr. Vol. 5/20/09, pp. 24-51). Agent Kelsch is a certified Interstate-nexus expert and he testified as such at the Movant's trial (id., pp. 25-26).

Since the Government's § 922(g) case depended on the origin of certain ammunition seized at the time of the Movant's arrest, Agent Kelsch endeavored to convince the jury that the ammunition was

- 28 -

manufactured outside of the Commonwealth of Massachusetts. Agent Kelsch opined that the ammunition was manufactured by the Remington Arms Company at either its Bridgeport, Connecticut, or Lonoke, Arkansas, plants (id., pp. 36-38). According to Agent Kelsch, the bullets seized had headstamps with "R.P." stamped on them (id., p. 37). He concluded that "R.P." denoted Remington Peters—Peters being an ammunition company that Remington had purchased a "long time ago" (id., p. 37).

Ultimately, Agent Kelsch testified that it was his expert opinion that the ammunition was not made in Massachusetts (id., p. 39). The basis of this expert opinion was founded on Agent Kelsch's reading of books, use of the Internet, and specifically calling Remington Arms Company to speak with Bill Conrad, a company representative (id., pp. 39-40). Counsel should have, but did not, object to Agent Kelsch's reliance on hearsay sources for the basis of his expert opinion.

Agent Kelsch's expert testimony was critical for the Government's charge that Movant possessed ammunition that had travelled in interstate commerce in violation of § 922(g). In the absence of Agent Kelsch's expert testimony, the Movant would have been acquitted of being a prohibited person in possession of ammunition. Consequently, counsel's failure to object to—and possibly have stricken—Agent Kelsch's "expert" testimony caused prejudice to the Movant's criminal proceedings.

14. Counsel Was Ineffective for Failing to Review and Investigate/Analyze the Videotape Evidence Used By the Government.

During direct testimony of Scott Conley, Chelsea Police Department Officer, the Government introduced and played a videotape made by a

pole camera at the time of the Chelsea parade on the day of the incident (Tr. 5/19/09, pp. 21-23, Gov. Exhibit 7). Movant alleges that the videotape was altered and counsel was ineffective for not timely objecting and properly preserving the issue for appellate review.

Movant repeatedly instructed Attorney Lee to object to the altered videotape, but counsel put-off the issue until it was too late in the criminal proceedings to address the issue (see Tr. Vol. 5/22/11, pp. 57-58). When counsel attempted to reopen the evidence to review the videotape before the jury and identify alterations, the trial Court denied counsel's request (id., p. 58).

Because of counsel's deficient performance related to the videotape, Movant's criminal proceedings were prejudiced because the jury considered the videotape evidence during its deliberations.

## 15. Counsel Failed to Properly Defend Movant During Sentencing Proceedings and State Post-Conviction cases.

Counsel failed to follow-up on Movant's Massachusetts post-conviction case that were dismissed and counsle failed to advise the Movant. Moreover, counsel failed to make proper objections to the government's presentence report and make arguments against the Movant's armed career offender classification as requested by the Movant. (Luna Aff. ¶ 19,20).

The Movant had filed state post-conviction petitions challenging the Constitutional validity of the state prior convictions used by the PSR to classify Movant under § 924(e)(ACCA). Counsel abandoned Movant's state post-conviction litigation.(id.¶19,20)

## VI.   RELIEF REQUESTED

WHEREFORE, the Movant would respectfully pray for the following forms of relief:

1.  Issue an Order to Show Cause directing the Government to Answer the Movant's § 2255 motion;

2.  Allow the Movant forty-five (45) days to file a pro se Reply to the Government's Response to the Movant's § 2255 motion;

3.  Appoint counsel and conduct an evidentiary hearing to fully develop facts underlying the Movant's claims for § 2255 relief;

4.  Vacate the Movant's conviction and sentence; and/or,

5.  Any other relief that this Court deems appropriate in this case.

Respectfully prayed for this _7th_ day of _December_ , 2012.

_____
Pascual Luna
Movant, Pro Se


## AFFIRMATION OF TRUTH

I, Pascual Luna, do hereby state under the penalty of perjury (28 U.S.C. § 1746) that the foregoing is true and correct to the best of my recollection.

Signed under penalty of perjury on this _7th_ day of _December_, 2012.

_____
Pascual Luna
Movant, Pro Se

- 31 -

## C E R T I F I C A T E   O F   S E R V I C E

I, Pascual Luna, do certify that I have placed a true, correct and complete copy of
of the attached Motion to Vacate, Correct or Set Aside Sentence pursuant to 28 USC
§ 2255, in the Legal Mail here at USP McCreary, in a sealed envelope, with first-
class postage pre-paid, for delivery by the United States Post Office, to the United
States District Court for the District of Massachusetts, Boston Division, addressed
in the manner shown below:

OFFICE OF THE CLERK
UNITED STATES COURTHOUSE
ONE COURTHOUSE WAY, Suite 2300
Boston, MA 02210-3002

Executed and Signed this $\frac{7th}{}$ day of December, 2012 C.E.

Pascual Luna

## A C K N O W L E D G E M E N T

Executed and Signed before me this _____, day of December, 2012, Pascual Luna
personally appeared before me and acknowledged to be the same.

Signature of Notary Public
My Commission Expires: 9 / 10 / 16.

"Notary Public"
Hope Thurman
State at Large, Kentucky
My Commission Expires on